Case 24-3726, CINCOM Systems Inc v. LabWare Inc. Argument not to exceed 15 minutes per side. Counsel, you may proceed for the appellant when ready. Good morning. May it please the court, Judge Mathis. My name is Joe Callow. I'm one of the attorneys representing the appellant, CINCOM Systems. I'd like to reserve four minutes for rebuttal. We're here, sir, because the court below granted summary judgment on the affirmative defense of statute of limitations. Six expert reports were presented. Dozens of deposition transcripts were put into the record. Over 10,000 pages of documents were submitted in years of discovery. But all of those issues regarding the trade secret and copyright infringement issues weren't addressed by the court. The sole issue addressed by the court was deciding statute of limitations on our UTSA claim as a matter of law where there were disputed facts, deposition testimony, e-mails, evidence created of competing narratives of whether what CINCOM did in 2014 was reasonable or not. Appellant puts into the record pages of bullet-pointed arguments interpreting e-mails, deposition testimony evidence. We have bullet points, paragraphs outlining deposition testimony, e-mails, evidence that was created. Basically just describe what every case we deal with has. It's people marshaling their arguments on both sides. So we get that. Yes, sir. What I'm troubled with on the statute of limitations argument from your perspective is that in 2014, it seems like from reading all the stuff that you're talking about, that your company just simply took a wait-and-see approach and didn't do anything. Contrast that with 2019 where your company got reinterested in this and did a lot of different things. Yes, sir. And that seems to be the heart of this case. Is there anything that was done in 2019 that couldn't have been done in 2014 that your company just chose not to do? Yes, sir. In 2019, our company saw a PowerPoint presentation presented by Labware that specifically said they were using VSE. For the first time, they publicly told people at a conference that that was happening. You seem to be saying now and in the briefs that in order to pursue one of these claims, somebody has to have admitted publicly that they're violating one of your trade secrets. No, sir. We have to believe that there is a reason to believe that it was occurring. And in 2014, we did not know they were using VSE. We did not see a contract with VSE. The employee that left Syncom to go work with Labware did not work with VSE while they were at it. Why didn't you make an inquiry? Because we had no reason to make an inquiry at the time based upon the investigation that was conducted. And the two people that were responsible for making that investigation testified. They talked with people. They reviewed the third-party post. They looked at contracts. Labware, which is in 2019, I think someone did reach out to Labware. So, I mean, how is it a reasonable investigation where you never go to the company that supposedly is using the trade secret? Well, in 2019, Labware told us that they were using it, so we knew at that time. And then we were able to investigate because we got access to actual lines of code. You basically seem to be saying you only have a duty to do an investigation if you know this meant a violation. That can't possibly be the law. No, sir. I'm saying we have a duty to investigate. We did an investigation, and the reasonableness of that investigation is a question of fact. And three decisions of this court over the past four years have said that it's a question of fact and can't be decided at the summary judgment stage. Courts have specifically said. Is there any dispute? There's a difference between a factual dispute about what happened. In other words, did your person make a phone call? Did your person, you know, get some information? And the legal import of those facts, if the evidentiary facts are undisputed, then that happens in every summary judgment. The legal import of them is decided. So can you point to, you know, he said, she said? Is there something in the factual dispute in 2014 where let's, for example, do you say we talked to somebody and they slammed the door in our face? And they say, no, no, he had you come in and talk. That's a factual dispute. The import of why did you talk to Bill and not talk to Mary seems to me is legal. Is that, you know, what's your response to that? The factual dispute is whether what we did was reasonable. Because it is undisputed that we took steps to investigate in 2014. So the question is, if we should have done something different or else, would that have changed the landscape? I don't see any indication that you actually did anything in 2014. Oh. You see an announcement that, well, you know an employee is leaving. Yes, sir. And you see a post that says that this person is going to work for somebody else. That seems to be, other than some internal discussions, the end result of which was wait and see, that you didn't do anything else. So tell me what else you did. They investigated the third-party post to confirm that it was an error, that what was in the third-party post was not accurate. But, again, this is all just conclusory. You say, well, we investigated. The whole question was, did you do an investigation? And if so, was it reasonable? So what did you do to investigate the post? They investigated the third-party post to determine it was inaccurate. By doing what? Just reading it? No, Mr. Ayers compared that post to information that he had about the former employee, Andres Falud, and confirmed that the third-party post was inaccurate based upon the actual postings of the third party. They then investigated whether or not there was a contract between CINCOM and Labware, and there was not. How was that a reasonable investigation? I thought there was evidence in the record that said that they were just going to wait to see until the stuff comes out. They really wanted to go after Mr. Falud, so it seemed like they were taking a wait-and-see approach as opposed to conducting an investigation. No, sir. The email says that they were going to wait to see if he actually posted something about BSE, but this email was the start of the investigation. Mr. Ayers testified, and we outlined it in both our brief and our reply. He looked at posts, they examined contracts, they determined that they did not have a relationship. Mr. Ayers knew prior relationships that prior companies to CINCOM had, and Labware wasn't mentioned in any of those. They also... They see the post, and the investigation, as you're describing it, is they looked at some internal company records. They looked at internal company records. They saw that Labware made an investment in a competing software called FARO, and it made sense to them that Labware was using FARO rather than BSE. And they had no other reason or basis to determine whether or not something should have been done in 2014. We could sit here and talk about coulda, woulda, shouldas. Maybe they should have called. The idea that if they had called Labware in 2014, that Labware would have said, oh, yeah, we're violating your rights, absolutely. Yeah, in 2014... They conducted a reasonable investigation. I agree. Labware may have said, absolutely not, we're not doing anything, but that goes to the reasonableness of the investigation when you suspect another company of taking your trade secrets, and you don't go to that company. Which is why we present it as a fact issue, and why in Metron and Compton and B&B Littleford, similar facts were all determined to be a question for the jury, not a determination by the court. In fact, the question was, in both of those cases that I just talked about, B&P and Campfield, the court said that the district court had to identify what would have happened differently, what steps should have been taken, and that would have made a difference. There's nothing in this record that if we had called the company that was concealing its conduct from us, that something would have happened differently. So when we look at the three different cases over the past four years, the district court in our case granted summary judgment on a statute of limitations defense based upon reading an email and saying, we should have done something different. B&P, Littleford, Metron and Campfield all say those are fact issues, and the reasonableness of that investigation is for a jury, not a judge at summary judgment. In B&P Littleford, which we cite, a jury could find that B&P satisfied its obligations to conduct a reasonable investigation. The court specifically said that was a jury determination and distinguished the two cases that the district court relied upon for that issue. We're saying that we've identified facts of what we did in 2014. We presented deposition testimony from the two individuals. We explained in the email where the witness says it was a guess, and he talked about what he did afterwards. That is an investigation. Whether they could have done something different or would have done something different is a question of fact for a jury not to be decided by the court on summary judgment, and it's hard for me to stand up here when I've got three cases in which the court has specifically reversed summary judgment on the same issue as mine under similar facts and say that the district court got it right. One of the things that I thought was interesting was looking at what you did in 2019, and that's why I asked you in the beginning about could you have done that in 2014. You essentially said... Well, you didn't really say whether you could or you couldn't. You basically said you didn't need to, so I understand that. So if we're looking at the other things that you did in 2019, is the company went online and found the software online. They found a reference someplace. I mean, they did something pretty obvious. Google, Labware's website, LinkedIn, GitHub, and Labware's user manuals. They looked at all of those things to see if there was any reference to this particular program that they had previously been waiting to see if somebody mentioned it online. So are there any of those things that you couldn't have done in 2014? Or are you just saying you didn't need to? Can I answer the question? Go ahead. Thank you. We did not have access to that in 2019 because we didn't have the PowerPoint presentation admitting that they were using VSE. And we didn't have that website. That's why you didn't do it. Could you have done it? What prohibited you from doing those follow-up steps in 2019, in 2014? Because we could not have seen the 5,000 lines of code that were there, and we could not have gained access to a PowerPoint that didn't exist. It seems to me the question is, could we have contacted Labware and asked the question of what they were doing? And the court is assuming that they would have said they're violating rights. Or somehow if we asked the question and they didn't answer it, somehow it's okay and now we're free. You would have found out something. There was one thing I want to follow specifically to Judge McKee. The PowerPoints didn't happen until 2019, give you that. But I thought he said you went online and found the code. So is that correct? Or is this somehow you got access to the code not until 2019? In 2019 we found a website that had 5,000 lines of code. In 2019 you found it, but did it exist in 2014? No, I don't believe it did, Your Honor. There's no evidence that did. Do you say so? Does anybody say so in it? I mean, it seemed very odd that they would post online 5,000 lines of code between 2014 and 20. I don't know. Third-party did, Your Honor. It wasn't Labware. It was the third-party website that we happened to find the line of code. This is the same Hoyer. No, Your Honor, no. Different. Different, Your Honor. Yes, sir. When you referred to third-party blog, I assume it was Mr. Hoyer. Is that what meant the first time you called him a third party? Third-party blog was Hoyer. The third-party blog was Hoyer. The third-party code is something entirely different. It has nothing to do with Mr. Hoyer. You just stumbled on it? Yes, sir. We happened to actually find it as we were looking. Totally stumbled upon it. Looking by Googling? In other words, when you say you just sat back, I'd like to hear you tell me how that 5,000 lines of code wasn't accessible or at least attempted to find it in 2014. I don't believe it was. And I believe Mr. Ayers testified in his deposition that when he was investigating in 2019, he found a website that had 5,000 lines of code. We specifically cite to that in our main brief and talk about that. So Ayers' depot is where I should look if I want to get excited about this. Yes, sir. And we have two pages talking about the 2019 investigation in our brief, our main brief, and the citation to it is in there. Let me follow up just real briefly so we don't spend any more time on this. What I understand Ayers said, and I don't understand what I'm about to read to you, but I want you to explain to me. Upon further digging, Ayers found part of Labware's code online and determined that, quote, the entire VSE development environment was sitting in the main executable of Labware 7.0.2, which is pretty gobsmacking actually. Yes, sir. So first of all, tell me what that means. So this is a development environment where you develop products and you develop code. Labware shouldn't have had access to the development environment, and they should not have been able to develop the code because we had the rights to do so under our asset purchase agreement and the license agreement that we referenced. So what they found is online, when he happened to stumble upon this, this was the actual development source code that is the secret sauce. It's what should not be out there because that's specifically what's licensed and protected, and he happened to find 5,000 lines of it, which should not have been out there, but was able to determine by looking. And Labware had posted that. Labware didn't post it. Someone else had posted it that was posting 5,000 lines or a sampling of it because they were looking for help regarding it. One follow-up and then I'm done. Okay. What does sitting in the main executable of Labware dot, dot, dot mean? What does that mean? It means that they were actually sending that code out to clients, which was fundamentally a problem.  Okay, thank you. Thank you, Counsel.  Good morning, Judge Mathis, and if it pleases the Court, my name is Mike Schabelsky on behalf of Labware. I will address first the statute of limitations question on the trade secrets. What the Court has to keep in mind is what SimCom alleged in the complaint was the act of misappropriation. It alleged that Labware misappropriated the VSC software by acquiring it and using it to make products without a license from SimCom. SimCom learned those very facts in 2014, six years before it sued Labware. SimCom learned that by investigating Labware on the Internet back in 2014, and that is an undisputed fact, Your Honor. It's in black and white from SimCom's own list. It's Deposition Exhibit 107, Record Entry 54-11, Page ID 1961. That is the email the District Court ultimately looked to and relied on to find that the statute of limitations had been triggered, because in that email, Mr. Bish, the head knocker at SimCom in charge of this software, writes to his colleagues, from everything I have been able to find, referring to I have been searching on the Internet, from everything I have been able to find, Labware is using Smalltalk V, referring to the software. We have no record of them being a VSC customer on a SimCom contract. So, before you go any further, just out of curiosity, how does that knowledge that you're summarizing for us compare to what they say they learned in 2019 from the PowerPoint? Is it really any different? It is no different. All they found, what he's referring to by looking on the code they found in 2019, is code that was made using the VSC software, which is exactly what they found out from their Internet searches of Labware. So they did more in 2014, Your Honor, than just looking at the Hoyer post and drawing a conclusion from it. They separately investigated Labware online, because they had never heard of Labware before. And found this information. Now, Your Honor, learning... Well, it sounds like what you're saying is this isn't so much, was there a reasonable investigation, because you're saying they did investigate. Yes, Your Honor. They found it, they just didn't act on it. Exactly, Your Honor. And in terms of whether or not he says they did a reasonable investigation, the record is undisputed, Judge Boggs, that they did no investigation of Labware. We cited in our brief the 30B6 testimony of Simcom on this point, from Mr. Bish. It appears on page 26 and 27 of our brief. We asked them, after you found out on the Internet that they were using the VSC software, did you conduct any investigation after that? The answer was no. Hard stop. No investigation. They didn't obtain Labware's products, Your Honors, to inspect them. They didn't go out and talk to Labware's customers. They didn't pick up the phone and call Labware. They didn't even ask Labware about this when they were together at conferences, industry conferences. They were together at least at two conferences in 2014, and they didn't ask the Labware people. They talked to Labware people, Mr. Valude, and didn't ask him. And just to be clear, the piece of paper you're waving says they're doing stuff with Smalltalk and they're not a customer. Those two things together are a statement of a violation. Is that fair? It is the statement of the violation they alleged. Yes, sir, Your Honor. And so that's saying that they knew that much and did nothing more. Correct, Your Honor. And if that's enough to be the violation, then of course the statute of limitations would start to run then. I couldn't put it any better, Your Honor. And doing nothing for... I know this case doesn't turn on this, but it sounds like you really were violating their trademark. No, Your Honor. First... So there is an explanation. Oh, absolutely, Your Honor. I'm not asking you to... Well, let me just... Two points I want to make. You can affirm this ruling without reaching the statute of limitations based on two undisputed facts. The first is that SimCom does not own and has never owned this software, this VSC software. The second undisputed fact is that Labware's parent bought the software at retail from the company that does at the time own the software. We bought it in a box on a shelf. That is a shrink-wrapped license. Exactly, Your Honor. It's the equivalent... What their argument is, everybody knows the classic trade secret is the formula for Coca-Cola. But if you go to a grocery store and buy a can of Coke, you have not misappropriated any trade secret. Well, that's all that Labware did, Your Honor. We went to the store and bought a box that had this software. And they're now saying we have somehow misappropriated that software. Well, Your Honor, these facts... Well, isn't there something there that you're not supposed to copy and modify it? At most, Your Honor, they are arguing a breach of the shrink-wrapped license. But they didn't plead a breach of contract case, and they can't because they're not the licensor. They're not a party to that contract. Labware, this defendant, is not a party to the contract. Its parent is. This is a misappropriation claim by the wrong plaintiff against the wrong defendant. The district court didn't rule out any... No, Your Honor. But I just wanted to address your point when you said did we do some misappropriation. Absolutely not. We dispute that entirely. But let me now address what their argument is about Mr. Volude. Your Honors, their argument ultimately is focusing on the wrong relationship. As this court discussed in the B.P. Littlefield case, misappropriation claim is a relationship-based breach. You have to look at what is the relationship because that is different for different statute of limitations. His arguments focus on Volude's relationship as a former employee of SimCom and whether the special project he was working on on this virtual machine breached his duties as an ex-employee. The relevant relationship, as the district court pointed out, is the relationship of Labware's parent, or Labware Inc., as a licensee. So the relevant question is having learned in 2014 that Labware was using the software without a license, did they conduct a reasonable investigation? And they didn't. My friend points to the B.P. Littlefield case as their sort of marquee case. But the fact, the major distinction there was that the fact that the plaintiff in B.P. Littlefield did attempt to conduct an investigation and was stymied. As the court held there, the plaintiff attempted an investigation but was stymied and because it attempted to unearth evidence of misappropriation but was stymied by a lack of documentation and its vendor's responses, the court held there was a reasonable dispute as to whether or not the statute had run. CINCOM was not stymied. It wasn't stymied because it did nothing. Those are undisputed facts. Indeed, Your Honors, in Defendant's Deposition Exhibit 109, which is Record Entry 5413, it is further undisputed, again from Mr. Bish's own words, that they decided to focus on Volude and not pursue Labware back in 2014 because they thought it would be difficult,  to go after Labware. So they were sufficiently suspicious having learned that we were using the software to assess their legal rights and made a business decision at that time not to go after Labware. Well, that's on them. They don't get the benefit of the plaintiff and B.P. Littlefield who did an investigation but was stymied. Your Honor, I would like to briefly address the copyright issue if I might and make three general points. The first is the court can affirm the district court's ruling granting summary judgment to Labware on the copyright for a very straightforward reason and that is the version of the software that Labware uses is not registered with the Copyright Office. Labware uses version 3.1 of the software. There is no dispute that version 3.1 is not registered. I thought the dispute was whether there was something in 100 that's in 1.3. That is their argument, yes. But what Murray Hill, the Murray Hill case that they rely on so much holds is that a derivative work must be registered before an infringement suit can be sustained based on the derivative work. In Murray Hill you had a situation where you had an original work,  was registered. A derivative work, a variation of the song was not registered.  the plaintiffs said the defendant used the derivative work violated the copyright even though obviously it's based on the original work. This court held that plaintiff could not bring the action because the derivative work that the defendant was using was not registered. That is the exact fact pattern here. And so that should really be dispositive,  We don't even need to worry about the earlier 100 registration that concerns part of version 1.3, not 3.1. But let me address the 100 registration. What the District Court held, Your Honor, was that CINCOM couldn't even prove a copyright violation of code protected by the 100 registration because CINCOM doesn't know what that code is. You see, all the record has of the 100 registration is the single page printout from the copyright office for the 100 registration. They don't have the deposit for that. What's the business about the deposit? I didn't understand that either. All the briefs say is the deposit isn't available. Right, yes, I'd be glad to elaborate. So think about a book,  If I'm going to copyright a book, I give the book to the copyright office. Here's the book. All right, well with code you have to deposit the code. So the deposit, the term deposit, the term of art, that simply means the submittal to the copyright office of the work that is the subject of the registration. I get that. You got to send it in so that they know what you're talking about. Yes. Why isn't it at the copyright office if you don't? I don't know and the record doesn't show. Nor did CINCOM have and was unable to produce some alternative proof of what that deposit is. So for example, we don't do you know whether it's on deposit? Did you go to see if it was on deposit? I don't I think the record does not indicate that it is on there is no evidence in the record whether it is or isn't on deposit. The point is that CINCOM disclaimed knowing what what the code is. You see the registration your honor on its face says it applies to just new matter what they call the revisions and supplemental text. From two earlier registrations a decade earlier. CINCOM admits they don't know what that revised in new text is. Whether it's at the copyright office or whether they have some other means to prove it. For example, maybe the company that made the registration kept files and here's what we sent. That's been lost in time your honor. We don't know you don't know whether it's lost or not. This is really just a burden of proof question. Well  solve their burden? Yes. You didn't try to do it. I did not attempt to satisfy their burden to prove no your honor. All right. Right. And so what the district court held is without the code that pertains to the 100 registration CINCOM can't do the fundamental basic thing you have to do in a copyright case with code. Which is to show did Labware copy that code and if so was any of that copy code properly protectable by the copyright act? Is it original expression or otherwise you know a valid claim? So as the party with the burden of proof they could not come forward on summary judgment and establish those things. And in fact your honor they didn't have this from the very beginning of the case. This is basic copyright 101 stuff. When CINCOM sued they should have had this code and known the registrations and instead they dragged Labware through now nearly 6 years of litigation without CINCOM even knowing what the code is they're suing on. Well that's not right and no wonder the district court granted us summary judgment. And what they're trying to do now is tap dance and say well yeah we can't prove the 100 registration but there are these two earlier registrations from a decade before. But three points there your honor. They didn't sue on those earlier registrations not in their complaint not in their discovery responses they disclaimed that in their 30B6 deposition. The argument rests on incorrect legal premise that somehow this registration for new and supplemental material gives them a de facto registration for some earlier versions of the code that's not the law. And third point your honor is they don't have the code for those earlier deposits. The only evidence in the record about those earlier registrations is a reference to them on the 100 registration. The record doesn't show what those earlier registrations cover or what the code is. They don't have the deposit they can't prove what the deposit is. So they have failed even on their burden of proof even if you're going to let them overlook their pleading deficiency and now six years later try to ride on those early registrations they can't prove that either. For all those reasons your honor we ask that you affirm the summary judgment. Thank you. Thank you,  Counsel, when you start I know you talk a lot about the trace but on the copyright infringement this business about the 100 registrations unfortunately not available for review. Why is that? The deposit wasn't available for us to  So contrary to what my expert testimony on this issue and we're not citing dicta or we're not making up facts this is straightforward Murray law rule that has been the law in this circuit for 20 years and has been adopted by five other circuits. The registration says that Digitalk registered new product You're going on to another issue here. The question is we asked you why isn't available and your answer was it isn't available because it isn't available. So just give us in the real world sense you call up or you write or you email the copyright office and you ask for something. We couldn't get it your honor. We tried. We couldn't get it. Well what did they say? It wasn't available. They didn't have it. I don't know what else to say is that my client called and they said   Because we know from the registration what Digitalk did. You have a piece of paper that says not available from the government. I don't know if I have a piece of paper that says that. It's not in the record but I know we tried to obtain it from the copyright office and could not. Yes. So the question is I'm trying to get to the basics here. Yes, your honor. Thank you. For me to try to go a little beyond it, you know, Mark Twain probably kept a copy of Huckleberry Finn. Is there a reason that the people who registered those didn't keep a copy? We acquired intellectual property from Digitalk. We could not find anything from Digitalk. So when you acquired the property, you didn't know what property you were acquiring? Well, we did from the actual asset purchase agreement that identified this copyrighted version and identified the software. And we have a copy of 1.3 which was incorporated in 3.1. We have a complete copy of the copyrighted material, version 1.3 referenced in the asset purchase agreement. And that was provided to all parties as part of the protocol. We have a complete copy of that 1.3 that was sent. 3.1? No, sir. That's why our expert went through and  1.3 to 3.1 and confirmed that the copyrighted material of 1.3 is in 3.1. So when he says that they used 3.1, not 1.3, our expert, Georg Heeg, identified the copyrighted code of 1.3 that's in 3.1. But the district judge said, and I'm paraphrasing here, that the district judge couldn't determine what code from 1.3 is in 3.1. So is the district judge just dead wrong? All the district judge had to do was look at this expert report or is the expert report not quite as clear as you're implying? The expert report from Georg Heeg goes through, ran a program, and compared 1.3 to 3.1 and we provided the Georg Heeg report. He identifies where 99.9% of code is matched up in classes or 84.7 or 100%. He goes through class by class and makes that determination and said it is impractical to think that you can use 3.1 when 60 to 90% of the 1.3 copyrightable code is in 3.1. You can't do it without violating. Isn't that a requirement for a copyright infringement claim for that code to be in the record and  court can do a line by line comparison? The code was put into the expert protocol pursuant to the magistrate judge's  and was available to everyone. If the  wanted to see it, all it had to do was provide it. It was already in the expert protocol that the magistrate judge required us to do so. The idea that somehow the district court ruled against us because it wanted to see underlying source code of VSE 3.1 and that could have been  addressed by us handing it to him since we had a copy of it, we've litigated for six years as Labware has  They copied our product and renamed it. We're talking about line by line consideration. They took a product called the Syncom Decompiler Debugger, called it the     off for  agreements that they said they had a one page license agreement but after they were sued they went in and got more license agreements because they didn't have any. They're the ones that said they had a      have a payment agreement       didn't    but they        it's complicated with all due respect you misunderstood here's where it is please reconsider we did not ask for reconsideration after summary judgment we asked for extra briefing in summary judgment because there were over 150 pages of disputed and undisputed facts that was before the district court and your mind screwed it up correct we did not ask for reconsideration from the district court I'm not saying you had to I'm just curious no we did not the district court said that the court incorporated from an earlier registration into a later copyrighted version is not protected by copyright that's fundamentally wrong under Murray Hill but that's just the wrong rule it's not dicta it's the rule that is specifically to the contrary and we provided 1.3 the version that is copyrighted in full all classes all codes as part of the expert protocol signed off on by the magistrate judge if the district court thinks that that was the error and wanted to see code on his own we would have happily done it but as you said Judge McKee I don't know what the judge would have done with lines of code or classes of code to make the determination what we did do was provide expert reports I understand thank you thank you counsel thank you your honor and thank you for your arguments and your briefing the case will be submitted